## In re WORRELL'S ESTATE.
## MURTEY v. STROUP et al.

No. 21665. Dec. 5, 1933.

Rehearing Denied Jan. 23, 1934.

Bond & Bond, Sandlin & Winans, and Montgomery, Hall, Young & Johnson, for plaintiff in error.

Battelle, Morgan, Strehlow & Anderson and Womack, Brown & Cund, for defendants in error.

RILEY, C. J. On July 11, 1929, C. C. Worrell, while in the hospital in Edmonton, Canada, executed what purported to be his last will and testament, designating therein his sister, Eva Worrell Murtey, as executrix, and wherein he bequeathed one John Ingle, Sr., an "automobile represented by his promissory note in my favor for $1,073." The will also directed the executrix to pay to said John A. Ingle, Sr., "whatever money he needs for his support the rest of his life," same to be paid out of the estate. The will then provided "all the rest and residue both real and personal whatsoever and wheresoever situated, I give to my said sister Eva Worrell Murtey."

Worrell died in said hospital on July 14, 1929. At the time of his death he was a resident of Stephens county, Okla., and left property both real and personal. Part of the real estate is located in Stephens county, Okla., and part in the Province of Alberta, Canada. He left no widow or children. His surviving heirs at law were Eva Worrell Murtey and Josie Stroup, sisters; Edgar Golden, Harry Golden, and Ray Golden, nephews; Eva Golden Redmon, a niece; Charlie Hulfish and Frank Hulfish, nephews; and Murtle Hulfish Parmenter, niece.

On July 27, 1929, Eva Worrell Murtey filed said will with her petition for probate thereof in the county court of Stephens county, Okla. Thereafter defendants in error, the other heirs at law of deceased, filed a contest on the probate of said will, alleging, in substance, that the purported will was not executed and attested as required by law and that at the date of the will decedent was not possessed of sufficient mental capacity to make a will, in that he was so debilitated by old age and long continued

serious illness as to render him unable to appreciate the value of his property, the nature of his acts, or to recognize the natural objects of his bounty. Thereafter the protest was supplemented by allegations of undue influence, menace, and duress.

Issues being joined, the hearing was had before the county court, resulting in an order denying probate of the will. An appeal was perfected. A hearing de novo was had in the district court, a jury was impaneled, and at the close of the evidence the court submitted to the jury the single question as follows:

"Gentlemen of the jury, you are instructed that there is only one question submitted for your decision in this case, and that is: Did the testator, C. C. Worrell, have testamentary capacity at the time he executed the instrument in evidence, purporting to be his last will and testament?"

The jury rendered a verdict as follows:

"Interrogatory No. 1.

"Q. At the time the said C. C. Worrell executed said will, did he have testamentary capacity? A. No."

Thereupon proponent moved the court for judgment admitting the will to probate upon the evidence, notwithstanding the finding of the jury on the question submitted. This motion was overruled, and judgment was entered denying the will to probate, and proponent appeals.

Both parties moved for judgment in their favor at the close of the evidence and before the question was submitted to the jury. There are many assignments of alleged error, but as a whole the question raised is that the evidence is insufficient to support the judgment, and that said judgment is against the clear weight of the evidence. The question was submitted to the jury under instructions fair to proponent. No objections were made or exceptions saved as to the instruction given.

The jury found, as above stated, that the testator did not possess testamentary capacity. While the verdict of a jury in such cases is not binding upon the court and is regarded in this jurisdiction as advisory only, where such verdict is approved and adopted by the trial court, as in the instant case, the findings of the jury are of some assistance. A judgment rendered in approval of and in accordance with such a verdict will not be set aside upon appeal, unless it is clearly against the weight of the evidence.

The evidence upon the question of testamentary capacity is voluminous, and in some respects sharply conflicting. The record contains some 400 pages, and it is impracticable to set out the evidence in detail.

The mental capacity of decedent on the afternoon of July 11, 1929, from about 2:30 p. m. to 4 p. m., is the material question. The salient facts are that on or about June 26, 1929, deceased was admitted to the Royal Alexander Hospital at Edmonton, Canada. At that time he was 72 years of age, and had an advanced case of diabetes. He was also suffering from a large carbuncle on his neck. The evidence shows that diabetes is a disease which tends to and often does produce or cause a condition of coma and that insulin is a drug or medicine often used in such cases to prevent coma or to arouse the patient from such condition.

There is evidence tending to show that shortly after Worrell entered the hospital, he, with the assistance of an attorney, transacted business apparently in the usual way. This was in connection with certain securities he had and the transfer of money from a bank in Duncan to a Bank at Edmonton, Canada. About July 6th, he talked with his attorney relative to a lease of his land in Canada.

It was stipulated that the statute law of the Province of Alberta, Canada, requires every hospital to keep a complete case record of each patient admitted and that such record was kept in the instant case. The record or chart was introduced in evidence and purports to show in a brief way the condition of the patient from time to time and the treatment given from the date he entered the hospital on June 26th until he died on July 14th. The record shows that the making of a will was suggested to deceased by his physician some six or eight days, or more, after decedent entered the hospital. The question was also discussed between decedent and the attorney who afterwards drafted the will, but the record does not disclose as between the attorney and decedent who first mentioned the question of making a will. The attorney who prepared the will, and who signed decedent's name thereto, after a rather unsuccessful attempt by decedent to sign his own name, testified that Mr. Worrell was perfectly rational and of sound understanding on each of the several occasions on which he conferred with him, viz., on July 2nd, 3rd, 4th, 6th, and 8th, and also on July 10th, when he drew a lease for him. That on the afternoon of July 11th, in response to a message from Mr. Worrell, the attorney went to the hospital for the

purpose of preparing the will, and after arriving at the hospital and preparing the will as directed by Mr. Worrell, he testified, decedent was perfectly sound and rational. He testified that he went out in the hallway and requested the head nurse and a nurse in training to come in and witness the signing of the will. Miss Birch, the head nurse, testified, in substance, that she went into the room after the will had been written at the request of Mr. Logan, the attorney; that she saw Mr. Worrell attempt to sign it, but that Mr. Worrell signed only a part of his name. That the pen ran off the paper, and Mr. Logan asked Mr. Worrell if he, Worrell, wanted him to sign his, Worrell's, name to the will, and that Mr. Worrell assented, and that thereupon Mr. Logan signed the name of Mr. Worrell to the will; that the attorney then asked Mr. Worrell if it was his desire that she and Miss Barnard sign the will as witnesses, and that Worrell replied in the affirmative, either saying "Yes" or nodding his head; that she then signed the will as a witness; that she thought Mr. Worrell was then rational, although weak. The testimony of Miss Barnard, who had actual care of Mr. Worrell on that day, was much the same as Miss Birch, but on cross-examination she said, in substance, that on that day, both before and after the will was signed, it was difficult for her to make Mr. Worrell understand what was wanted of him in giving him his ordinary attentions.

These three were the only witnesses present when the will was signed.

Mr. Logan, on cross-examination, in testifying as to what took place in the preparation of the will, said:

"A. Mr. Logan, you say now that you went in there and sat down and asked Mr. Worrell if he wanted you to draw or write his will and he said yes; you didn't testify to that before in your deposition? A. I don't know. Q. Now, then, you say he said yes; now what was it you said to him or him to you? Mr. Sandlin: We object to that as repetition. Court: Sustained. Mr. Brown: Exceptions. Q. Go ahead and tell what he said. A. I think I said then, 'What do you want to put in your will'? Q. What did he say to you? A. He then spoke about executrix. Q. That is the next thing he said, 'executrix'? A. Yes. Q. And after you got through talking about executrix in order to go ahead, what was said by you or him to you? Don't look at your notes. A. I am not looking at the notes; I am looking at the will. Q. Give us something from memory. A. Next thing he spoke about was giving John Engel the car. Q. What was the next thing he said about writing in his will? A. About giving Engel enough to keep him.

Q. Where do you provide for the executrix, in the first part or last part? A. Second paragraph of the will. Q. The first part is what? A. Preliminary. Q. 'I hereby appoint my sister, Eva Worrell Murtey, executrix'? A. Yes. Q. Second paragraph is where he gives this stuff to John Engel. A. Gives him the car and makes provisions to keep him. Q. When he got through with Engel, what was the next thing? A. That is where the pause came. Q. And then after this pause you suggested to him that you pray over it, is that the idea? A. I said, 'I think we ought to ask God's guidance.' Q. You did that? A. Yes; he said, 'That is a good idea.' Q. Then after you had done that, which one spoke first? A. Yes, I think I spoke first. Q. What did you say? A. I said, 'Do you want to leave anything to the rest of the Engels? Q. And he replied to you he didn't? A. Yes. Q. What then did you say? A. Another pause. I said, 'What about your sister, Mrs. Murtey'? Q. What was his reply to that? A. 'Yes, I think I'll leave the rest of my property to her.' Q. Then you finished the will? A. No, I repeated that to him to be sure he was clear. I said, 'You want to leave all the rest of your property to Mrs. Murtey'? and he said 'Yes'. Q. You wrote that down in the will? A. Then I asked another question before I completed it. I said, 'Is that all now?'"

The chart or hospital record, when taken in connection with the testimony of the physicians as to the effects of diabetes, the different medicines given to counteract such effect, and the testimony of Dr. Allen, who appears to have had charge of the case, presents a fair picture of the mental condition of the decedent for two or three days before the will was signed, and on that day and thereafter until his death on the 14th.

The record shows that decedent was given insulin regularly two or three times each day after he entered the hospital until on July 9th. On that day he refused insulin during the whole day. On the 10th he was given insulin but once. Dr. Allen did not know that the insulin was not administered regularly on the 9th and 10th. About 11 a. m., July 11th, Dr. Allen saw the patient himself and testified he found him in a very bad condition. The chart shows at 4 a. m. on that day he seemed to be in a stupor. Dr. Allen was called at 11 a. m. It was then that he discovered that the insulin had not been given regularly the two days before. As to his condition at that time, Dr. Allen testified:

"At 11:00 a. m. on July the 11th, I called myself, and following that, he was given insulin; in fact, I told them to give it to him, and he was pretty badly used up at that

time. Q. He was in bad condition then, when you discovered that he didn't have the insulin? A. Certainly. That is what called my attention to it, and I told him he should have the insulin whether or no. Q. At that time he wouldn't be in the best condition to make a will? A. From this I shouldn't think so. Q. And if the 11th was the day the will was made on, you wouldn't think he was in condition on the 11th to make a will? A. On July 11th, at 11:00 a. m. I saw him, and that must have been the time that I found out he hadn't had his insulin properly, and 'read the riot act' to the house surgeon for not reporting it to me. I think by this, it must have been about that time, because that's the time that he was so bad."

At 12:15 p. m. that day, and again at 7:15 p. m., and at 8 p. m., insulin was given. The first dose was the usual amount, the second dose was a little less, and the last dose given that day was much larger than the usual amount.

In the meantime, between 2:30 p. m. and 4 p. m., the will was drawn and signed.

It is apparent that the insulin was given down to July 8th, to prevent coma, as the chart shows no condition of unconsciousness or semi-unconsciousness until the morning of July 11th, when the chart shows him to have been in a stupor. It was at 11 o'clock on that morning that Dr. Allen was called and found that the insulin had not been given and found the patient as he termed it, "Pretty badly used up at that time." It was then, as he testified, when he "read the riot act" to the house surgeon for not reporting it to him.

After that the insulin must have been given to bring the patient out of the condition described. It was given three times that day in less than eight hours, and the last time in a considerably increased amount.

A great deal of medical opinion testimony was produced by both sides, directly in conflict, as might be expected in such cases.

In Bilby v. Stewart, 55 Okla. 767, 153 P. 1173. it is said:

"Testamentary capacity, or the lack thereof, is a question of fact. 40 Cyc. 1331; Gordon v. Gordon, 92 Kan. 730, 142 P. 242. There is no rule by which it may be determined, with precision, where capacity ends and incapacity begins, but this question should be determined from all the facts and circumstances of each case."

From all the facts and circumstances in evidence in this case the jury found as a fact that decedent did not have testamentary capacity at the time the will was made and signed, the trial court approved the finding and entered judgment accordingly. We are not prepared to say from the record that the judgment is against the clear weight of the evidence so as to require a reversal.

No material or prejudicial error is shown in the admission or rejection of evidence. The judgment is therefore affirmed.

CULLISON, V. C. J., and SWINDALL, ANDREWS, McNEILL, OSBORN, and WELCH, JJ., concur. BAYLESS and BUSBY, JJ., absent.